IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

UNITED STATES OF AMERICA,
      Plaintiff,

v.

2:23-CR-076-Z-BR-(1)

BRIAN LAMONT DAVIS,
      Defendant.

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant Brian Lamont Davis's ("Davis") Motion to Suppress ("Motion") (ECF No. 34). Defendant moves to suppress (1) all statements made at, or subsequent to, his initial detention on August 28, 2023, (2) evidence that the Government seized during a search of his vehicle following a canine free-air sniff, and (3) testimony of any law enforcement officer regarding statements or evidence acquired during the traffic stop. *Id.* at 2. Defendant posits that law enforcement did not have probable cause to search the vehicle he was driving because the search occurred after the officer issued him a warning for speeding. *Id.* at 3. For the reasons stated below, the Court **DENIES** Defendant's Motion.

### BACKGROUND

On August 28, 2023, Trooper Edgard Castillo ("Trooper Castillo") travelled westbound on Interstate Highway 40 in Oldham County, Texas. ECF No. 35 at 2. While driving, Trooper Castillo observed a black 2022 Cadillac CTS driving eastbound, which appeared to exceed the posted speed limit. *Id.* Castillo activated his mobile radar and confirmed that the vehicle was traveling at 78 miles per hour in a posted 75 miles per hour zone. *Id.* Trooper Castillo turned around and caught up to the vehicle. *Id.* He then activated his emergency lights and initiated a traffic stop after conducting a registration check and visually checking for any other traffic violations. *Id.*

Trooper Castillo approached the vehicle from the passenger side where he contacted Davis and the front passenger, Richard Gamble ("Gamble"). *Id.* at 2. Trooper Castillo advised Davis of the reason for the stop, explained that he would receive a warning, and asked for his license and registration. *Id.* Davis complied, but appeared visibly nervous as he handed his license and vehicle paperwork to Trooper Castillo. *Id.* Castillo also noticed a faint smell of suspected marijuana emanating from the vehicle and, when attempting to speak with Gamble, Davis interrupted — shouting that it was Gamble's birthday. *Id.* at 3. While visiting with Davis and Gamble, Trooper Castillo learned that the pair recently rented the Cadillac CTS, travelled from Las Vegas, and possessed only two small bags in the back seat with minimal clothing. *Id.* at 3.

Suspecting criminal activity, Castillo decided to separate the pair and asked Davis to meet him in the patrol vehicle, where he asked questions about the pair's trip. *Id.* Davis made inconsistent statements about his travel. When pressed to explain the inconsistencies, he told Trooper Castillo that he didn't want to answer any more questions. *Id.* But after Trooper Castillo explained that the interview was typical for a traffic stop on this section of highway, Davis continued to engage and backtracked on his previous statements. *Id.* at 4.

Trooper Castillo continued the interview with Davis as the pair attempted to contact the rental car company to confirm that Davis lawfully rented the vehicle he was driving. While waiting for Davis to retrieve the correct rental car agreement and related paperwork, Trooper Castillo returned to the rental vehicle and spoke with Gamble.[1] *Id.* at 4. During this brief visit, Gamble explained that he and Davis traveled to California to visit Davis's cousin. *Id.* But when Trooper Castillo returned to his patrol vehicle, Davis told him that they did not visit with any family on the trip. *Id.*

---

[1] The "paperwork issues" included: (1) a female rented the vehicle and not Austin Davis as alleged by Davis and (2) the rental agreement listed a different vehicle than the black Cadillac CTS the Defendants drove. ECF No. 35 at 4.

Based on his interaction with Davis and Gamble, Trooper Castillo believed that the pair were involved in criminal activity. After resolving the paperwork issues with the rental car agreement and issuing a warning for speeding, Trooper Castillo asked Davis if he could ask a few more questions. *Id.* at 5. Trooper Castillo then asked whether Davis was transporting anything illegal and whether he would grant consent to search the rental vehicle. *Id.* Davis he did not have anything illegal in the vehicle but would not grant consent for a search. *Id.* Trooper Castillo then informed Davis that he would call a narcotics detection canine unit to the scene. If the canine did not alert on the vehicle, then Davis would be free to go. *Id.*

Around twenty-one minutes after the conclusion of the stop, a narcotics detection canine conducted a free-air sniff on the rental vehicle and alerted to the presence of narcotics. *Id.* Trooper Castillo then searched the vehicle. He located suspected marijuana in the glovebox and five large plastic-wrapped bundles in the trunk of the vehicle, which contained 62,142 grams of cocaine. *Id.* at 5–6.

**LEGAL STANDARD**

The Fourth Amendment protects individuals against unreasonable searches and seizures. *United States v. Roberts*, No. 2:17-CR-129-D, 2018 WL 1740076, at *4 (N.D. Tex. Apr. 11, 2018). Courts must generally suppress evidence derived from an unreasonable search or seizure under the "fruit-of-the-poisonous-tree doctrine." *United States v. Alvarado-Zara*, 782 F.3d 246, 249 (5th Cir. 2015) (citing *United States v. Cotton*, 722 F.3d 271, 278 (5th Cir. 2013)). "Warrantless seizures are 'per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.'" *Id.* (quoting *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014)).

"The decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). Even a pretextual traffic stop does not violate the Fourth Amendment, so long as the officer making the stop has probable cause to believe a traffic violation has occurred. *United States v. Escalante*, 239 F.3d 678, 680–81 (5th Cir. 2001). Once a legal traffic stop has concluded, "a temporary, warrantless detention of an individual constitutes a seizure for Fourth Amendment purposes and must be justified by reasonable suspicion that criminal activity has taken or is currently taking place; otherwise, evidence obtained through such a detention may be excluded." *United States v. Garza*, 727 F.3d 436, 440 (5th Cir. 2013). "Under the two-part *Terry* reasonable suspicion inquiry, [the Court asks] whether the officer's action was: (1) 'justified at its inception'; and (2) 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *Terry v. Ohio*, 392 U.S. 1, 19–20 (1968)). "Reasonable suspicion requires more than merely an unparticularized hunch, but considerably less than proof of wrongdoing by a preponderance of the evidence." *Id*.

Free-air sniffs by narcotics-detection dogs are so minimally invasive that they do not constitute a "search" or a "seizure" for Fourth Amendment purposes. *United States v. Place*, 462 U.S. 696, 707 (1983). "A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." *Illinois v. Caballes*, 543 U.S. 405, 409 (2005).

A warrantless search of an automobile is valid under the Fourth Amendment when a police officer has probable cause. *Almeida-Sanchez v. United States*, 413 U.S. 266, 269 (1973). A police officer has probable cause to conduct a search when the facts available would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present. *Florida v. Harris*,

4

568 U.S. 237, 243 (2013). An alert by a narcotics-detection dog provides probable cause to search. *Id*. at 248; *United States v. Sanchez-Pena* 336 F.3d 431, 444 (5th Cir. 2003).

ANALYSIS

Davis argues that the warrantless search of his rental vehicle by Trooper Castillo violated his Fourth Amendment rights. Specifically, he originally contended that (1) Trooper Castillo's initial detention of Davis was without reasonable suspicion and (2) Trooper Castillo impermissibly extended the traffic stop beyond any lawful conception. ECF No. 34 at 5, 7. However, Davis later conceded the lawfulness of his initial detention at the Suppression Hearing. *See* Tr. at 121:3 ("The traffic stop was justified.").

The Government contends that Trooper Castillo developed reasonable suspicion of additional criminal activity during the initial traffic stop and lawfully extended the stop through the free-air sniff from a drug-detection dog. ECF No. 35 at 6.

Though Defendant ultimately conceded the legality of the initial traffic stop, the Court will make a finding on this issue. Where an officer has probable cause to believe that a traffic violation has occurred, he may reasonably stop the vehicle. *Whren*, 517 U.S. at 810. Trooper Castillo testified — and Davis did not object — that he observed Davis exceed the posted speed limit. Tr. at 16:13–19. Trooper Castillo further testified that he then activated his mobile radar and recorded Davis's rental vehicle traveling at 78 miles per hour in a 75 miles per hour zone. Tr. at 16:22–23. Based on this testimony, the Court **FINDS** that the decision to stop the vehicle was reasonable and legal under the Fourth Amendment as conceded by Davis. Tr. at 121:3.

## A. Trooper Castillo initiated a valid *Terry* stop.

In accordance with *Terry v. Ohio* and its progeny, the Court must determine whether Trooper Castillo's action in detaining Davis was (1) "justified at its inception" and (2) "reasonably

5

related in scope to the circumstances which justified the interference in the first place." *Lopez-Moreno*, 420 F.3d at 430 (quoting *Terry*, 392 U.S. at 19–20).

### 1. The traffic stop was justified at its inception.

The Court **FINDS** that Trooper Castillo's detention of Davis was "justified at its inception." For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle. "The Supreme Court has stated that in making a reasonable suspicion inquiry, a court must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Johnson*, 2006 WL 1041148, at *3 (N.D. Tex. Apr. 20, 2006) (Fitzwater, J.) (quoting *Lopez-Moreno*, 420 F.3d at 430). As previously discussed, Trooper Castillo initiated the stop because he observed Defendant driving 78 miles per hour in a 75 miles per hour zone. Accordingly, the Court concludes and **FINDS** that Trooper Castillo had probable cause to believe Defendant was in violation of Tex. Transp. Code. Ann. § 545.351, Maximum Speed Requirement, at the time he stopped Defendant's vehicle. Therefore, Trooper Castillo's action was justified at its inception and the first prong of *Terry* is satisfied.

### 2. Trooper Castillo developed reasonable suspicion of additional criminal activity during the traffic stop.

Under *Terry*'s second prong, the Court asks whether Trooper Castillo's actions after stopping the vehicle "were reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004). "An officer's subsequent actions are not reasonably related in scope to the circumstances that caused him to stop the vehicle if he detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless he develops reasonable

suspicion of additional criminal activity in the meantime." *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010), *modified on other grounds*, 622 F.3d 383 (5th Cir. 2010). If, however, "the officer develops reasonable suspicion of additional criminal activity . . . he may further detain [the] occupants [of the vehicle] for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *United States v. Andres*, 703 F.3d 828, 833 (5th Cir. 2013) (alterations in original) (quoting *Pack*, 612 F.3d at 350). "Reasonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the search and seizure." *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006). "The determination . . . must be made based on the totality of the circumstances and the collective knowledge and experience of the officers." *Id*. at 631–32 (citation omitted).

Here, the Court **FINDS** that the totality of Defendants' words and actions provided reasonable cause for Trooper Castillo to suspect that Defendants were trafficking narcotics and to subsequently detain Defendants after the *initial* traffic stop concluded. Specifically, the Court **FINDS** at least seven categories relevant to the aforementioned "totality of the circumstances" analysis:

- Davis and Gamble traveled on Interstate Highway 40, which is a drug trafficking corridor;

- Davis exhibited extreme nervousness while being questioned;

- Davis and Gamble gave conflicting stories on the nature of their travel;

- Davis and Gamble rented the vehicle in Las Vegas, which is a known drug-trafficking corridor;

- The vehicle was rented by a third party, which is typical of drug trafficking organizations;

7

- The minimal luggage possessed by Davis and Gamble despite the almost 2,000 mile nature of the trip; and

- The suspected smell of marijuana;

Tr. at 108:22–109:16.

At the Motion hearing and in subsequent briefing, Davis challenged the questions that Trooper Castillo presented to Davis and Gamble during the traffic stop. Specifically, Davis argued that once an officer initiates a traffic stop for one purpose, "the officer is not allowed to vary from that mission, to depart from that mission, [or] to do things that are not a part of that mission." *Id.* at 120:1–4; *see also* ECF No. 49 at 3 ("By engaging the passenger with questions about Defendant's travels, Trooper Castillo was adding time to this stop when he did not have a reasonable suspicion of narcotics or other criminal activity."). Davis essentially argues that these questions were utilized to prolong the stop until the arrival of the canine unit in violation of the Supreme Court's holding in *Rodriguez v. United States*, 575 U.S. 348 (2015).

Defendant misunderstands the law. A law enforcement officer may ask questions on subjects unrelated to circumstances that caused the stop, so long as these unrelated questions do not extend the duration of the stop. *Pack*, 612 F.3d at 350. Here, Trooper Castillo asked these questions during the regular course of the initial stop. True, the initial stop was lengthy as argued by Davis but not because of Trooper Castillo's questions. Instead, as highlighted by Davis, Trooper Castillo was not able to resolve the paperwork issues related to the rental agreement until time-marker 24:08. ECF No. 49 at 3. By this time, Trooper Castillo already had at least seven different relevant categories that gave rise to an articulable reasonable suspicion of additional criminal activity. And because resolution of the rental agreement was germane to the initial stop, Trooper Castillo did not unlawfully extend the stop to obtain evidence of additional criminal activity. *See Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (inspecting vehicle registration and insurance

8

are "ordinary inquiries incident to the traffic stop") (citing *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)) (cleaned up).

Taken together — and based on the totality of the circumstances — the above combined facts could lead a reasonable and prudent officer to suspect Davis was engaged in trafficking narcotics. The preponderance of the evidence supports that Trooper Castillo developed reasonable suspicion of additional criminal activity during the initial stop — thus authorizing him under *Terry* and its progeny to detain Defendants while waiting for a canine unit to arrive. Therefore, the Court **FINDS** that the Government has met its burden and proven that law enforcement met both prongs of *Terry*, and Davis was not unreasonably detained in violation of the Fourth Amendment.

**B.  The Canine Unit arrived without significant delay.**

Defendant argued at the suppression hearing — for the first time — that the 22 minutes between issuing a warning for a traffic violation and conducting a free-air sniff violates Defendant's rights. Specifically, Defendant argues that "22 minutes I believe has been found by the Supreme Court as well as federal courts to be excessive in waiting for a K-9 to come for an open[-]air sniff and especially considering in this case when the initial inquiry into the K-9 came within a minute or two of the stop." Tr. at 122:24–123:3.

Defendant is incorrect. The Fifth Circuit has affirmed similar delays. *See, e.g.*, *United States v. Davis*, 620 F. Appx 295, 297 (5th Cir. 2015) ("The [canine] unit arrived 30 minutes later and 51 minutes after the initial stop."). The timeline contemplated in *Davis* is remarkably similar to the delay here. Accordingly, to the extent that the Defendant preserved this argument, the Court finds that it is without merit.

9

**CONCLUSION**

Because the Court **FINDS** Trooper Castillo had probable cause to conduct and extend the initial traffic stop, Trooper Castillo did not unreasonably detain Defendant while waiting for a canine unit. Accordingly, the Court **FINDS** the subsequent search of Davis's vehicle and the seizure of 62,142 grams of cocaine was lawful under the Fourth Amendment. For the reasons stated above, Defendant's Motion to Suppress is **DENIED**.

**SO ORDERED**.

June 11, 2024.

_____
MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

10